FILED

MAY 2 3 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  Eduardo Rodriguez,
   Florida Bar Number: 0165654
2  KIM, PARDY & RODRÍGUEZ, P.A.
   230 East Marks Street
3  Orlando, Florida 32803
   Post Office Box 3747
4  Orlando, Florida 32802-3747
   Telephone: 407-481-0066
5  Facsimile: 407-481-7939
   Email: erodriguez@bellsouth.net
6  Attorneys for Plaintiff

**E-filing**

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                      (SAN FRANCISCO DIVISION)

11

12  **In re: Bextra and Celebrex Marketing Sales**   | **MDL No. 1699**
    **Practices and Product Liability Litigation**
13                                                    | **District Judge: Charles R. Breyer**
                                                      | **Magistrate:**
14

15

16  ARLOWYN I. CODY,                              **C 07    2723**
                                              Case No.
17              Plaintiff,
                                              **CIVIL COMPLAINT**
18  v.

19  PFIZER, INC., PHARMACIA CORP., and         **JURY TRIAL DEMANDED**
20  G.D. SEARLE & CO.,

21              Defendants.

22

23          **ARLOWYN I. CODY**, Plaintiff, by and through the undersigned counsel, brings

24  this action against Defendants PFIZER, INC., PHARMACIA CORP., and G.D. SEARLE & CO.

25  (hereafter "Defendants") and alleges as follows:

26

27

28

    Bextra-FL-MDL                                              COMPLAINT

I.    **PARTIES**

1.    This is an action for damages arising from Defendants' design, manufacture, sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication Valdecoxib, trade name BEXTRA® ("Bextra").

2.    Plaintiff was at all relevant times an adult resident of the State of Nebraska.

3.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with its principal place of business in New York, New York. In 2003, Pfizer acquired Pharamcia for nearly $60 billion. At all relevant times Pfizer and/or its predecessors in interest were engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling the drug Valdecoxib, under the trade name Bextra in Puerto Rico and nationwide.

4.    Defendant Searle ("Searle") is a Delaware corporation with its principal place of business in Illinois. At all relevant times, Searle has been engaged in the business of marketing and selling BEXTRA nationwide and in Puerto Rico. Searle is a subsidiary of Pfizer, acting as its agent and alter ego in all matters alleged within this Complaint.

5.    Defendant Pharmacia ("Pharmacia") is a Delaware corporation with its principal place of business in New Jersey. At all relevant times, Pharmacia, and its predecessors in interest have been engaged in the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting, and selling Bextra nationwide and in Puerto Rico.

II.    **JURISDICTION AND VENUE**

6.    This is an action for damages, which exceeds seventy-five thousand dollars ($75,000.00).

7.    There is complete diversity of citizenship between the Plaintiff and Defendants. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and because there is complete diversity of citizenship between Plaintiff and Defendants.

8.    This action is being filed in the Northern District of California Pursuant to MDL 1699, Pretrial Order No. 2. However, venue is proper in the United States District Court for the District of Nebraska ("the District") pursuant to 28 U.S.C.A. § 1391. Defendants

1 marketed, advertised and distributed the dangerous product in the district, thereby receiving

2 substantial financial benefit and profits the dangerous product in the district, and reside in the

3 district under 28 U.S.C.A. § 1391(c), such that venue is proper.

4          9.     At all relevant times herein, Defendants were in the business of designing,

5 manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and

6 selling their product, Bextra.  Defendants at all times relevant hereto designed, developed,

7 manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce

8 (including Puerto Rico) the aforementioned prescription drug.  Defendants do substantial business

9 in Puerto Rico, advertise in the district, receive substantial compensation and profits from sales of

10 Bextra in the District, and made material omissions and misrepresentations and breaches of

11 warranties in the District so as to subject them to *in personam* jurisdiction in the District.  In

12 engaging in the conduct alleged herein each defendant acted as the agent for each of the other

13 defendants, or those defendant's predecessors in interest.

14 **III.    INTERDISTRICT ASSIGNMENT**

15          10.    Assignment to the San Francisco Division is proper as this action is related

16 to *In Re: Bextra and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to

17 the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,

18 2005.

19 **IV.    FACTUAL BACKGROUND**

20     **A.    Facts Regarding Plaintiff**

21          11.    Plaintiff was prescribed, and began taking, Bextra on or about July 26,

22 2004.

23          12.    As a direct and proximate result of using Bextra, Plaintiff suffered severe

24 cardiovascular injuries.  Specifically, on or about August 28, 2004, Plaintiff suffered a heart

25 attack.

26          13.    Plaintiff's healthcare providers were at the time of Plaintiff's initial injury,

27 unaware—and could not have reasonably known or have learned through reasonable diligence—

28

1   that such injury directly resulted from Defendants' negligent and otherwise culpable acts,

2   omissions, and misrepresentations or from Plaintiff's ingestion of Bextra.

3          14.    Plaintiff used Bextra in a proper and reasonably foreseeable manner and

4   used it in a condition that was substantially the same as the condition in which it was

5   manufactured and sold.

6          15.    Plaintiff would not have used Bextra had Defendants properly disclosed the

7   risks associated with the drug.

8        **B.**    **Facts Regarding Bextra**

9          17.    Bextra is one of a class of pain medications called non-steroidal anti-

10   inflammatory drugs ("NSAIDs"). Aspirin, naproxen (trade name Aleve), and ibuprofen (trade

11   name Advil) are examples of well-known NSAIDs.

12          18.    NSAIDs reduce pain by blocking the body's production of pain

13   transmission enzymes called cyclo-oxygenase or "COX." There are two forms of COX

14   enzymes—COX-1 and COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and

15   COX-2 enzymes.

16          19.    In addition to decreasing inflammation, the prostaglandins that are

17   supported by COX-1 enzymes are involved in the production of gastric mucus; this protects the

18   stomach wall from the hydrochloric acid present in the stomach. It is generally accepted in the

19   medical community that by blocking the COX-1 enzyme, the body's ability to protect gastric

20   tissue is hampered and as a result, can cause harmful gastrointestinal side effects, including

21   stomach ulceration and bleeding.

22   Prostaglandin I2 is the predominant cyclooxygenase product in endothelium, inhibiting platelet

23   aggregation (preventing clot formation), causing vasodilation, and preventing the proliferation of

24   vascular smooth muscle. Whereas older NSAIDS inhibit Thromboxane A2 and Prostaglandin I2,

25   the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a potent platelet

26   aggregator and vasoconstrictor which is synthesized by platelets. Therefore, while the older

27   NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors support it.

28

1    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore pain by inhibiting both

2    COX-1 and COX-2 enzymes simultaneously.  As would be expected, traditional NSAIDs may

3    cause ulcers in the stomach.  However, traditional NSAIDs do not cause blood clots, rather they

4    actually reduce the risk of clots and help protect heart function.

5            20.    Defendants and other pharmaceutical companies set out to remedy these

6    ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors

7    that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of

8    gastric tissue while still reducing inflammation.

9            21.    In making this decision, Defendants and their predecessors in interest either

10   intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2

11   inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood

12   clots, and giving rise to various clot-related cardiovascular events, including stroke, stroke,

13   unstable angina. The vasoconstriction and fluid retention cause the hypertension.

14           22.    The Defendants launched Celebrex, the first of the three major COX-2

15   inhibitor drugs, in early 1999 and initiated a massive marketing campaign to convince doctors and

16   consumers of the superiority of their new "blockbuster" drug over less inexpensive NSAIDs.  In

17   May, 1999, Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

18           23.    Seeking increased market share in this extremely lucrative market,

19   Defendants, and their predecessors in interest, also sought approval of a "second generation"

20   selective COX-2 inhibitor and filed for FDA approval of Bextra on January 16, 2001 for the

21   (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief

22   of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

23           24.    The FDA granted approval of the new drug on November 16, 2001, for two

24   particular uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

25   of osteoarthritis and rheumatoid arthritis.

26           25.    The FDA did not grant approval to market and promote Bextra for the

27   management or prevention of acute pain.

28

1    26.    The FDA did not grant approval to promote Bextra as more effective than
2    other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers
3    or gastric bleeding.

4    27.    Even without a label that allowed Defendants to legitimately claim superior
5    safety, when Defendants, and their predecessors-in-interest, began marketing Bextra in early
6    2002, Defendants and their representatives and agents misrepresented the safety profile of Bextra
7    to consumers, the medical community, healthcare providers, and third party payors.  Defendants
8    proceeded to promote, market, sell, and distribute Bextra as a much safer and more effective pain
9    reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

10    **C.    Facts Regarding Bextra's Safety**

11    28.    The potential for cardiovascular risk of selective COX-2 inhibitors was
12    known to Defendants long before the FDA granted market approval for Bextra.  By 1997, and
13    prior to the submission of the New Drug Application (the "NDA") for Bextra, Defendants were
14    aware that, by inhibiting COX-2, Bextra altered the homeostatic balance between prostacylcin
15    synthesis and thromboxane and thereby, increased the prothrombotic effects of the drugs, causing
16    blood clots to form in those who ingested it.  *See* Topol, E.J., *et al.*, *Risk of Cardiovascular*
17    *Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954.  Although all
18    COX-2 inhibitors have this mechanism of action, Bextra was the most selective COX-2 inhibitor
19    proposed for approval.  Accordingly, it had the greatest potential to cause adverse cardiovascular
20    and cerebrovascular events.

21    29.    As Pharmacologist, Dr. Garrett Fitzgerald, of the University of
22    Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on
23    October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as
24    Bextra, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet
25    aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

26    30.    Nevertheless, the Defendants submitted an NDA to the FDA for Bextra,
27    omitting information about the extent of the risks associated with Bextra.  Without a complete

28

1  picture of the potential hazards associated with the drug, the FDA approved Bextra on or about
2  November 16, 2001.

3        31.    Based on the studies performed on Bextra, other COX-2 inhibitors, and
4  basic research on this type of selective inhibitor which had been widely conducted, Defendants
5  knew when Bextra was being developed and tested that selective COX-2 inhibitors posed serious
6  cardiovascular risks for anyone who took them, and presented a specific additional threat to
7  anyone with existing heart disease or cardiovascular risk factors.

8        32.    Studies show that selective COX-2 inhibitors, including Bextra, decrease
9  blood levels of a prostacyclin. When those levels fall, the arteries are more vulnerable to clotting,
10  high blood pressure, stroke, and stroke.

11        33.    The defendants marketed Bextra in the United States for three years (April,
12  2002 – April 7, 2004). During that time the FDA forced the defendants to strengthen the warning
13  label several times. The enhanced warnings followed in the wake of the results of additional
14  cardiovascular studies performed by Defendants, as well as numerous complaints to the FDA
15  regarding various adverse events.

16        34.    Prior to strengthening the warning for Bextra, Defendants had knowledge
17  of the coronary and cardiovascular safety risks of Bextra from several studies. *See e.g.*, Otto,
18  E.O., *Efficacy and Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in*
19  *Patients Undergoing Coronary Artery Bypass Surgery*, *The Journal of Thoracic and*
20  *Cardiovascular Surgery*, June 2003 at 1481.

21        35.    Even Defendants' own (and Pfizer funded) post-drug approval meta-
22  analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data
23  showing an increased cardiovascular risk in patients treated with Bextra after undergoing
24  coronary artery bypass graft surgery. Observed events included stroke, stroke, and blood clots in
25  the legs and lungs. The results were particularly relevant and striking as each of the study
26  participants who was a post-bypass surgery patient was taking anti-clotting agents at the time
27  their exposure to Bextra was being tracked.

28

Bextra-FL-MDL                              - 7 -                              COMPLAINT

36. In mid-January 2005, a peer-reviewed paper from the University of Pennsylvania found that in patients having heart bypass surgery, those who took Bextra in the intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a stroke or stroke.

37. Despite years of studies on selective COX-2 inhibitors, as well as the disturbing new studies specifically analyzing the risks of Bextra, Defendants failed to take any action to protect the health and welfare of patients, but instead, continued to promote the drug for sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis Drug Advisory Committee meetings.

38. On April 7, 2005, the FDA finally insisted that Defendants "voluntarily withdraw" Bextra from the U.S. market, stating:

> ... the Agency has concluded that the overall risk versus benefit profile of Bextra is unfavorable. This conclusion is based on the potential increased risk for serious cardiovascular (CV) adverse events, which appears to be a class effect of non-steroidal anti-inflammatory drugs (NSAIDs) (excluding aspirin) ... and the fact that Bextra has not been shown to offer any unique advantage over the other available NSAIDs. (FDA Alert for Healthcare Professionals, April 7, 2005.)

39. Continuing, the FDA noted:

> Bextra has been demonstrated to be associated with an increased risk of serious adverse CV events in two short-term trials in patients immediately post-operative from coronary artery bypass graft (CABG) surgery .... FDA has concluded that it is reasonable to extrapolate the adverse CV risk information for Bextra from the short-term CABG trials to chronic use given the fact that other COX-2 selective NSAIDs have been shown in long-term controlled clinical trials to be associated with an increased risk of serious adverse CV events (e.g., death, MI, stroke), and the well described risk of serious, and often life-threatening gastrointestinal bleeding .... To date, there have been no studies that demonstrate an advantage of Bextra over other NSAIDs that might offset the concern about the serous skin risks, such as studies that show a GI safety benefit, better efficacy compared to other products, or efficacy in a setting of patients who are refractory to treatment with other products."

40. Dr. Garret A. Fitzgerald, cardiologist and pharmacologist at the University of Pennsylvania, presented the preliminary results of his Bextra study at the American Heart Association meeting in New Orleans, Louisiana. His study, containing 12 trials including

1    5,930 patients, found 2.19 times the number of strokes among patients given Bextra. *New York*

2    *Times*, Nov. 10, 2004.

3              41.    Instead of studying Bextra prior to its market launch, the

4    Defendants simply relied upon data and information gathered from Celebrex trials and studies.

5    The Celebrex data put Pfizer on notice that Cox-2 NSAIDs are, at the very least, associated with a

6    disproportionately increased number of adverse cardiovascular events. Taking the results from

7    the Celebrex trials in conjunction with the available medical literature; the Defendants knew

8    about the increased incidence and association between Bextra and the potentially life-threatening

9    dangers it could cause.

10              42.    The New York Times uncovered the truth about the inadequate

11    studies by interviewing Pfizer researcher Dr. Feczko - Pfizer's president for worldwide

12    development.

13              Over all, Pfizer has performed much less research on Bextra than
              on Celebrex, Dr. Feczko said. Most of the company's studies of
14              Bextra have been short term, with many lasting only two weeks.
              As a result, Pfizer has less data to support its contention that Bextra
15              is safe , he said.

16                                        ***

17
              Dr. Feczko of Pfizer explained that the company felt it was not as
18              important to study Bextra extensively because the company
              believed that the drug was similar to Celebrex.
19
    *The New York Times*, February 5, 2005.
20
21              43.    The Celebrex data relied upon by the Defendants was not adequate.

22    On July 23, 2005, the New England Journal of Medicine published the results of its investigative

23    research noting: "Most data on the cardiovascular risks associated with celecoxib have come

24    from observational studies or short-term randomized trials." N. ENG. J. MED. 352;25 at 2649.

25              44.    On December 23, 2004, three (3) researchers from the well-respected Vanderbilt

26    University published an article in the New England Journal of Medicine. The doctors wrote: "To

27    protect the safety of the public, we write to recommend that clinicians stop prescribing

28    Valdecoxib (Bextra) except in extraordinary circumstances." N. ENG. J. MED. 351;26. The

Bextra-FL-MDL                          - 9 -                              COMPLAINT

1    authors cite to two (2) recent studies "which showed a 3-fold increase in serious cardiovascular

2    injuries in patients receiving Valdecoxib after coronary-artery bypass grafting." Later, on

3    February 17, 2005, the New England Journal of Medicine published the results of a study

4    conducted by eight (8) doctors with similarly alarming results. N. ENG. J. MED. 2005;352.

5    45.    In January 2005, Drs. Fitzgerald, Furberg and Psaty published an editorial in

6    *Circulation*, the official journal of the American Heart Association. This editorial was based on a

7    meta-analysis of two (2) clinical studies, and discusses the association between intravenous

8    administration of an identical drug, and oral administration of Bextra. All three doctors found a

9    "3-fold higher risk of cardiovascular injuries with the drug than with a placebo." *Cir.* 2005;

10   111:249.

11   46.    The scientific data available during and after Bextra's approval process made clear

12   to Defendants that their formulation of Bextra would cause a higher risk of blood clots, stroke

13   and/or myocardial infarctions among Bextra consumers, alerting them to the need to do additional

14   and adequate safety studies.

15   47.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of*

16   *Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing

17   to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular risk and

18   benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established

19   coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and

20   have the highest risk of further cardiovascular events."

21   48.    Dr. Topol was also the author on the study published in August 2001 in JAMA

22   (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who

23   used COX-2 inhibitors.

24   49.    Based upon readily available scientific data, Defendants knew, or should have

25   known, that their pre-approval testing of Bextra did not adequately represent the cross-section of

26   individuals who were intended consumers and therefore, likely to take Bextra. Therefore,

27   Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for Bextra (noting

28

Bextra-FL-MDL                          - 10 -                                    COMPLAINT

1     that: "**Platelets**: In four clinical studies with young and elderly ($\geq$ 65 years) subjects, single and

2     multiple doses up to 7 day mg BID had not effect on platelet aggregation").

3          50.     Had Defendants done adequate testing prior to approval and "market launch,"

4     rather than the extremely short duration studies done on the small size patient base that was

5     actually done) Pharmacia and Searle's scientific data would have revealed significant increases in

6     incidence of strokes and myocardial infarctions among the intended and targeted population of

7     Bextra consumers.  Adequate testing would have shown that Bextra possessed serious side

8     effects.  Defendants should have taken appropriate measures to ensure that their defectively

9     designed product would not be placed in the stream of commerce and/or should have provided

10    full and proper warnings accurately and fully reflecting the scope and severity of symptoms of

11    those side effects should have been made.

12         51.     In fact, post-market approval data did reveal increased risks of clotting, stroke and

13    myocardial infarction, but Defendants intentionally suppressed this information in order for them

14    to gain significant profits from continued Bextra sales.

15         52.     Defendants' failure to conduct adequate testing and/or additional testing prior to

16    "market launch" was based upon their desire to generate maximum financial gains for themselves

17    and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

18    At the time Defendants manufactured, advertising, and distributed Bextra to consumers,

19    Defendants intentionally or recklessly ignored and/or withheld information regarding the

20    increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew

21    that if such increased risks were disclosed, consumers would not purchase Bextra, but instead

22    would purchase other cheaper and safer NSAIDs.

23    **D.     Facts Regarding Defendants' Marketing and Sale of Bextra**

24         53.     The Defendants rushed Bextra to the market in an effort to regain Cox-2 market

25    share.  In response to the introduction of Vioxx, and without performing adequate research, the

26    Defendants hastily introduced their own more selective Cox-2 inhibitor, Bextra, to the market.  In

27    doing so, Pfizer, admittedly, relied upon problematic research results from its study of Celebrex.

28

54.    Pfizer stuck to its original plan – focus on marketing and avoid studying Bextra. Thus, it was reported: "The positioning for Bextra began more than a year and a half before it hit the market. Pharmacia conducted research about the arthritis market to examine gaps in treatment, said Sylvia McBrinn, Pharmacia's Vice President for global marketing for Bextra."[1] Bextra's marketing research was conducted over a year and a half, while science took a backseat, with one small study for Bextra lasting not even one year and the rest lasting only weeks in duration.

55.    At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers would perceive Bextra as a safer and better drug than its other NSAIDs and, therefore, purchase Bextra.

56.    Such an ineffective and unreasonably dangerous drug could only be widely prescribed as a result of a tremendous marketing campaign. In addition to being aggressive, the Defendants' marketing campaign was fraudulent and misleading. But for fraudulent and misleading advertising, consumers would not have purchased Bextra, a more costly prescriptive drug, that was not effective for its intended purposes.

57.    On January 10, 2005 the FDA issued Pfizer a written reprimand for its promotional activities. The reprimand reads: "These five promotional pieces [3 Celebrex and 2 Bextra] variously: omit material facts … and make misleading safety, unsubstantiated superiority, and unsubstantiated effectiveness claims." This was not the Defendants first offense related to its Cox-2 inhibitors. The FDA also reprimanded Pfizer on October 6, 1999 noting: "DDMAC has reviewed these promotional pieces and has determined that they are false or misleading because they contain unsubstantiated comparative claims, misrepresentations of Celebrex's safety profile, and are lacking in fair balance."

58.    Bextra was never approved for the treatment of acute pain. Without such approval, Pfizer was prohibited from marketing Bextra for such an indication. Nevertheless, in May of 2002, Pfizer issued a press release announcing the publication of a study in the Journal of the American Dental Ass'n (JADA) concluding that Bextra is effective in the treatment of acute pain

---

[1] *New Jersey Record*, North Jersey Media Group, Inc., April 14, 2002.

1   associated with dental surgery. Interestingly, the dental study was sponsored by the defendants
2   and three of the five authors were employees of Pharmacia.

3       59.     Essentially, Pfizer was attempting to circumvent the FDA by promoting a study it
4   funded and authored for an unapproved use. Once the results were published, Pfizer's aggressive
5   promotional campaign continued. Pfizer issued a press release touting Bextra's efficacy for the
6   treatment of acute pain. After the press release, Dr. Steve Geis, Group Vice President of Clinical
7   Research was reported to have said the following: "Post-surgical pain can be under-managed and
8   cause patients tremendous discomfort. ... This investigational study suggests that Bextra may
9   offer promise in acute pain management and further study is required."[2]

10      60.     Defendants widely and successfully marketed Bextra throughout the United States
11  by, among other things, conducting promotional campaigns that misrepresented the efficacy of
12  Bextra in order to induce a widespread use and consumption. Bextra was represented to aid the
13  pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made
14  misrepresentations by means of media advertisements, and statements contained in sales literature
15  provided to Plaintiff's prescribing physicians.

16      61.     Despite knowledge of the dangers presented by Bextra, Defendants and
17  Defendants' predecessors in interest, through their officers, directors and managing agents for the
18  purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy
19  the known defects of Defendants' product, Bextra, and failed to warn the public, including
20  Plaintiff, of the serious risk of injury occasioned by the defects inherent in Defendants' product,
21  Bextra. Defendants and their officers, agents and managers intentionally proceeded with the
22  inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,
23  Bextra, knowing that persons would be exposed to serious potential danger, in order to advance
24  their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a
25  conscious disregard for the safety of the public and particularly of Plaintiff.

26      62.     In an elaborate and sophisticated manner, Defendants aggressively marketed
27  Bextra directly to consumers and medical professionals (including physicians and leading medical

28
    ─────────────────
    [2] Press Release: docguide.com March 25, 2002.

    Bextra-FL-MDL                        - 13 -                              COMPLAINT

1   scholars) in order to leverage pressure on third party payors, medical care organizations, and large

2   institutional buyers (*e.g.*, hospitals) to include Bextra on their formularies. Faced with the

3   increased demand for the drug by consumers and health care professionals that resulted from

4   Defendants' successful advertising and marketing blitz, third party payors were compelled to add

5   Bextra to their formularies. Defendants' marketing campaign specifically targeted third party

6   payors, physicians, and consumers, and was designed to convince them of both the therapeutic

7   and economic value of Bextra.

8       63.     Defendants represented that Bextra was similar to ibuprofen and naproxen but was

9   superior because it lacked any of the common gastrointestinal adverse side effects associated with

10   these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance, NSAIDS can,

11   in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-term use.

12   Defendants promoted Bextra as a safe and effective alternative that would not have the same

13   deleterious and painful impact on the gut, but that would be just as effective, if not more so, for

14   pain relief.

15       64.     Bextra possessed dangerous and concealed or undisclosed side effects, including

16   the increased risk of serious cardiovascular events, such as strokes, unstable angina, cardiac

17   clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes. In

18   addition, Bextra was no more effective than traditional and less expensive NSAIDs and, just like

19   traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding.

20   Defendants chose not to warn about these risks and dangers.

21       65.     Defendants knew of these risks before the U.S. Food and Drug Administration (the

22   "FDA") approved Bextra for sale on November 16, 2001, but Defendants ignored, downplayed,

23   suppressed, omitted, and concealed these serious safety risks and denied inefficacy in its

24   promotion, advertising, marketing, and sale of Bextra. Defendants' omission, suppression, and

25   concealment of this important information enabled Bextra to be sold to, and purchased, or paid

26   for by, the Consumers at a grossly inflated price.

27       66.     Consequently, Bextra captured a large market share of anti-inflammatory drugs

28   prescribed for and used by patients. In 2004 alone, sales of Bextra exceeded $1 billion, despite

1   the significantly higher cost of Bextra as compared to other pain relievers in the same family of
2   drugs.

3       67.    Because Defendants engaged in a promotional and marketing campaign that
4   featured an advertising blitz directly targeted to consumers, that touted Bextra as a safer drug than
5   other drugs in its class, while uniformly failing to disclose the health risks of Bextra, Defendants
6   were able to justify pricing Bextra significantly higher than the cost of generic aspirin. In reality,
7   that price inflation was not justified. Had Defendants disclosed the truth about Bextra,
8   Defendants would not and could not have reaped the billions of dollars in Bextra sales that were
9   achieved as a direct result of the concealment, omission, suppression, and obfuscation of the
10  truth.

11      68.    Instead of revealing the risks of Bextra, Defendants intentionally downplayed the
12  risks from Bextra in news releases when Bextra's safety was challenged for the first time in the
13  mainstream media. *See e.g.*, Nov. 10, 2004 Pfizer News Release ("Pfizer Inc. said a New York
14  Times article published today draws unsubstantiated conclusions about the cardiovascular safety
15  of its Cox-2 medicine Bextra . . ."). Defendants similarly had earlier downplayed the risks in
16  communicating to healthcare providers misleadingly stating that "available clinical information
17  for Bextra suggests there is no increased risk of cardiovascular thromboembolic events in people
18  treated for osteoarthritis (OA) and rheumatoid arthritis (RA)" Oct. 15, 2004 *Pfizer News Release*.
19  Defendants intentionally, deliberately, knowingly, and actively concealed, omitted, suppressed,
20  and obfuscated important and material information regarding the risks, dangers, defects, and
21  disadvantages of Bextra from Plaintiff, the public, the medical community, and the regulators.
22  This concealment and omission was deliberate, knowing, active, and uniform, was intended to
23  induce and maximize sales and purchases of Bextra, and prevented Plaintiff from obtaining all the
24  material information that would be important to their decisions as reasonable persons to purchase,
25  pay for, and/or use Bextra.

26      69.    Defendants' systematic, active, knowing, deliberate, and uniform concealment,
27  omissions, suppression, and conduct caused Plaintiff to purchase, pay for, and/or use Bextra; and
28  caused Plaintiff's losses and damages as asserted herein.

Bextra-FL-MDL         - 15 -        COMPLAINT

1      70.    Had Defendants done adequate testing prior to approval and "market launch,"

2  Pharmacia's scientific data would have revealed significant increases in stroke and myocardial

3  infarction amongst the intended population of Bextra consumers. Adequate testing would have

4  shown that Bextra possessed serious side effects. Defendants should have taken appropriate

5  measures to ensure that their defectively designed product would not be placed in the stream of

6  commerce and/or should have provided full and proper warnings accurately and fully reflecting

7  the scope and severity of symptoms of those side effects should have been made.

8      71.    In fact, post-market approval data did reveal increased risks of clotting, stroke and

9  myocardial infarction, but this information was intentionally suppressed by Defendants in order

10  for them to gain significant profits from continued Bextra sales.

11      72.    Defendants' failure to conduct adequate testing and/or additional testing prior to

12  "market launch" was based upon their desire to generate maximum financial gains for themselves

13  and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

14      73.    At the time Defendants manufactured, advertising, and distributed Bextra to

15  consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding

16  the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants

17  knew that if such increased risks were disclosed, consumers would not purchase Bextra, but

18  instead would purchase other cheaper and safer NSAID drugs.

19      74.    At all times relevant herein, Defendants engaged in a marketing campaign with the

20  intent that consumers would perceive Bextra as a better drug than its competitors and, therefore,

21  purchase Bextra.

22  <center>**CLAIMS FOR RELIEF**</center>

23  <center>**FIRST CLAIM FOR RELIEF:**</center>
<center>**Negligence**</center>

24

25      75.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if
fully set forth herein.

26

27      76.    Defendants owed Plaintiff a duty to exercise reasonable care when designing,
manufacturing, marketing, advertising, distributing, and selling Bextra. This duty included the

28

Bextra-FL-MDL              - 16 -              COMPLAINT

1  duty not to introduce a pharmaceutical drug, such as Bextra, into the stream of commerce that

2  caused users to suffer from unreasonable, dangerous or untoward adverse side effects.

3      77.    At all relevant times to this action, Defendants owed a duty to properly warn

4  Plaintiff and the Public of the risks, dangers and adverse side effects of their pharmaceutical drug

5  Bextra.

6      78.    Defendants breached their duties by failing to exercise ordinary care in the

7  preparation, design, research, testing, development, manufacturing, inspection, labeling,

8  marketing, promotion, advertising and selling of Bextra, including:

9              a.    failing to use due care in the preparation and development of Bextra

10  to prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

11             b.    failing to use due care in the design of Bextra to prevent the

12  aforementioned risk of injuries to individuals when the drugs were ingested;

13             c.    failing to conduct adequate pre-clinical testing and research to

14  determine the safety of Bextra;

15             d.    failing to conduct adequate post-marketing surveillance and

16  exposure studies to determine the safety of Bextra;

17             e.    failing to completely, accurately and in a timely fashion, disclose

18  the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiff,

19  consumers, the medical community, and the FDA;

20             f.    failing to accompany Bextra with proper warnings regarding all

21  possible adverse side effects associated with the use of Bextra;

22             g.    failing to use due care in the manufacture, inspection, and labeling

23  of Bextra to prevent the aforementioned risk of injuries to individuals who used Bextra;

24             h.    failing to use due care in the promotion of Bextra to prevent the

25  aforementioned risk of injuries to individuals when the drugs were ingested;

26             i.    failing to use due care in the sale and marketing of Bextra to

27  prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

28

Bextra-FL-MDL                          - 17 -                          COMPLAINT

1          j.          failing to use due care in the selling of Bextra to prevent the

2    aforementioned risk of injuries to individuals when the drugs were ingested;

3          k.          failing to provide adequate and accurate training and information to

4    the sales representatives who sold Bextra;

5          l.          failing to provide adequate and accurate training and information to

6    healthcare providers for the appropriate use of Bextra; and

7          m.          being otherwise reckless, careless and/or negligent.

8          79.          Despite the fact that Defendants knew or should have known that Bextra caused

9    unreasonable and dangerous side effects which many users would be unable to remedy by any

10   means, Defendants continued to promote and market Bextra to consumers, including Plaintiff,

11   when safer and more effective methods of pain relief were available.

12         80.          Defendants were, or should have been, had they exercised reasonable care, in

13   possession of evidence demonstrating that Bextra caused serious side effects. Nevertheless, they

14   continued to market their products by providing false and misleading information with regard to

15   the safety and efficacy of Bextra.

16         81.          Defendants knew or should have known that consumers such as Plaintiff would

17   foreseeably suffer injury as a result of their failure to exercise ordinary care as described above.

18         82.          As a result of Defendants' actions, Plaintiff, and the Plaintiff's prescribing

19   physicians were unaware, and could not have reasonably known or have learned through

20   reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,

21   and that those risks were the direct and proximate result of Defendants' acts, omissions, and

22   misrepresentations. Plaintiff incurred the following damages:

23         83.          Plaintiff sustained serious cardiovascular injuries. Plaintiff required healthcare

24   and services incurring direct medical losses and costs including care for hospitalization, physician

25   care, monitoring, treatment, medications, and supplies.

26         84.          Defendants' conduct as described above was committed with knowing, conscious,

27   wanton, willful, and deliberate disregard for the value of human life and the rights and safety of

28

Bextra-FL-MDL                          - 18 -                          COMPLAINT

1    consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish

2    Defendant and deter it from similar conduct in the future.

3         WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

4    damages, and exemplary and punitive damages together with interest, the costs of suit and

5    attorneys' fees and such other and further relief as this Court deems just and proper.

6                            **SECOND CLAIM FOR RELIEF:**
                    **Strict Liability – Defective Design and Failure to Warn**

7         85.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

8    fully set forth herein and further alleged as follows:

9         86.    At all times relevant to this action, Defendants were suppliers of Bextra, placing

10   the drug into the stream of commerce. Bextra was expected to and did reach Plaintiff without

11   substantial change in the condition in which it was manufactured and sold.

12        87.    Bextra was unsafe for normal or reasonably anticipated use.

13        88.    Bextra was defective in design or formulation because when it left the hands of the

14   manufacturer and/or supplier, it was unreasonably dangerous and more dangerous than an

15   ordinary consumer would expect. Bextra was also defective and unreasonably dangerous in that

16   the foreseeable risk of injuries from Bextra exceeded the benefits associated with the design

17   and/or formulation of the product.

18        89.    At all times material hereto, Bextra was sold, marketed, distributed, supplied,

19   manufactured and/or promoted by the Defendant, in a defective and unreasonably dangerous

20   condition at the time it was placed in the stream of commerce in ways which include, but are not

21   limited to, one or more of the following particulars.

22        90.    When placed in the stream of commerce, the drug contained unreasonably

23   dangerous design defects and was not reasonably safe as intended to be used, subjecting Plaintiff

24   to risks which exceeded the benefits of the drug:

25             n.      When placed in the stream of commerce, it was defective in design

26   and formulation, making use of the drug more dangerous than an ordinary consumer would

27   expect and more dangerous than other similar drugs;

28

Bextra-FL-MDL                            - 19 -                            COMPLAINT

1          o.      The drug was insufficiently tested;

2          p.      The drug caused harmful side effects which outweighed any

3     potential utility;

4          q.      The drug was not accompanied by adequate instructions and/or

5     warnings to fully apprize the consumers, including the Plaintiff, of the full nature or extent of the

6     risks and side effects associated with use, thereby rendering Defendants liable to the Plaintiff,

7     pursuant to the Restatement (Second) of Torts, § 402A, as adopted by the Florida Courts.

8          91.     The drug was defective and unreasonably dangerous when it left the possession of

9     the Defendants in that it contained warnings insufficient to alert consumers, including the

10    Plaintiff, to the dangerous risks and reactions associated with the drug, including, but not limited

11    to, increased risk of cardiovascular events, and other serious and life threatening side affects.

12         92.     The Plaintiff could not have discovered any defect in the drug through the exercise

13    of care.

14         93.     Defendants, as manufacturers of a prescription drug, are held to the level of

15    knowledge of an expert in the field.

16         94.     Bextra as manufactured and supplied by Defendants was also defective due to

17    inadequate warnings, and/or inadequate clinical trials, testing and study, and inadequate reporting

18    regarding the results of the clinical trials, testing and study. Defendants failed to perform

19    adequate testing before exposing Plaintiff to the medication, testing which would have shown that

20    Bextra had the potential to cause serious side effects including strokes like that which affected

21    Plaintiff.

22         95.     Bextra as manufactured and supplied by Defendants was defective due to

23    inadequate post-marketing warnings or instructions because, after Defendants knew or should

24    have known of the risk of injuries from Bextra, they failed to provide adequate warnings to the

25    medical community and the consumers, to whom they were directly marketing and advertising

26    Bextra; and, further, it continued to affirmatively promote Bextra as safe and effective.

27         96.     Bextra was manufactured, distributed, tested, sold, marketed, advertised and

28    promoted defectively by Defendants, and as a direct and proximate cause of Defendants'

Bextra-FL-MDL                          - 20 -                          COMPLAINT

1  defective design of Bextra, Plaintiff used Bextra rather than other safer and cheaper NSAIDs. As

2  a result, Plaintiff suffered the personal injuries described above.

3       97.    Information given by Defendants to the medical community and to the consumers

4  concerning the safety and efficacy of Bextra, especially the information contained in the

5  advertising and promotional materials, did not accurately reflect the potential side effects of

6  Bextra.

7       98.    Defendants had a continuing duty to warn the Plaintiff of the dangers associated

8  with the drug.

9       99.    Had adequate warnings and instructions been provided, Plaintiff would not have

10  taken Bextra, and would not have been at risk of the harmful side effects described herein.

11       100.    Defendants acted with conscious and deliberate disregard of the foreseeable harm

12  caused by Bextra.

13       101.    As a result of Defendants' actions, Plaintiff and the Plaintiff's prescribing

14  physicians were unaware, and could not have reasonably known or have learned through

15  reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,

16  and that those risks were the direct and proximate result of Defendants' acts, omissions, and

17  misrepresentations.

18       102.    Plaintiff sustained serious cardiovascular injuries. Plaintiff required healthcare

19  and services incurring direct medical losses and costs including care for hospitalization, physician

20  care, monitoring, treatment, medications, and supplies.

21       103.    Defendants' conduct as described above was committed with knowing, conscious,

22  wanton, willful, and deliberate disregard for the value of human life and the rights and safety of

23  consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish

24  Defendant and deter it from similar conduct in the future.

25       WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

26  damages, and exemplary and punitive damages together with interest, the costs of suit and

27  attorneys' fees and such other and further relief as this Court deems just and proper.

28

Bextra-FL-MDL                          - 21 -                          COMPLAINT

#### THIRD CLAIM FOR RELIEF:
#### Breach of Express Warranty

104.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if fully set forth herein.

105.    Defendants expressly represented to Plaintiff and other consumers and the medical community that Bextra was safe and fit for its intended purposes, that it was of merchantable quality, that it did not produce any dangerous side effects, particularly any unwarned-of side effects, and that it was adequately tested.

106.    These warranties came in the form of:

    a.    Defendants' public written and verbal assurances of the safety and efficacy of Bextra;

    b.    Press releases, interviews and dissemination via the media of promotional information, the sole purpose of which was to create an increased demand for Bextra, which failed to warn of the risk of injuries inherent to the ingestion of Bextra, especially to the long-term ingestion of Bextra;

    c.    Verbal and written assurances made by Defendants regarding Bextra and downplaying the risk of injuries associated with the drug;

    d.    False and misleading written information, supplied by Defendants, and published in the Physician's Desk Reference on an annual basis, upon which physicians relied in prescribing Bextra during the period of Plaintiff's ingestion of Bextra, and;

    e.    advertisements.

107.    The documents referred to above were created by and at the direction of Defendants.

108.    Defendants knew or had reason to know that Bextra did not conform to these express representations in that Bextra is neither as safe nor as effective as represented, and that Bextra produces serious adverse side effects.

Bextra-FL-MDL                           - 22 -                           COMPLAINT

1    109.    Bextra did not and does not conform to Defendants' express representations

2    because it is not safe, has numerous and serious side effects, including unwarned-of side effects,

3    and causes severe and permanent injuries.

4    110.    Plaintiff, other consumers, and the medical community relied upon Defendants'

5    express warranties.

6    111.    As a result of Defendants' actions, Plaintiff and the Plaintiff's prescribing

7    physicians were unaware, and could not have reasonably known or have learned through

8    reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,

9    and that those risks were the direct and proximate result of Defendants' acts, omissions, and

10    misrepresentations.

11    112.    Plaintiff sustained serious cardiovascular injuries.  Plaintiff required healthcare

12    and services incurring direct medical losses and costs including care for hospitalization, physician

13    care, monitoring, treatment, medications, and supplies.

14    113.    Defendants' conduct as described above was committed with knowing, conscious,

15    wanton, willful, and deliberate disregard for the value of human life and the rights and safety of

16    consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish

17    Defendant and deter it from similar conduct in the future.

18    WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

19    damages, and exemplary and punitive damages together with interest, the costs of suit and

20    attorneys' fees and such other and further relief as this Court deems just and proper.

21
## FOURTH CLAIM FOR RELIEF:
### Breach of Implied Warranty

22

23    114.    Plaintiff incorporates by reference all of the paragraphs of this Complaint as if

fully set forth herein.

24

25    115.    Defendants manufactured, distributed, advertised, promoted, and sold Bextra.

116.    At all relevant times, Defendants knew of the use for which Bextra was intended

26    and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

27

28

Bextra-FL-MDL                      - 23 -                      COMPLAINT

1    117.    Defendants were aware that consumers, including Plaintiff, would use Bextra for

2    treatment of pain and inflammation and for other purposes.

3    118.    Plaintiff and the medical community reasonably relied upon Defendants' judgment

4    and expertise to only sell them or allow them to prescribe Bextra only if it was indeed of

5    merchantable quality and safe and fit for its intended use.  Consumers, including Plaintiff, and the

6    medical community, reasonably relied upon Defendants' implied warranty for Bextra.

7    119.    Bextra reached consumers, including Plaintiff, without substantial change in the

8    condition in which it was manufactured and sold by Defendants.

9    120.    Defendants breached their implied warranty to consumers, including Plaintiff;

10   Bextra was not of merchantable quality or safe and fit for its intended use.

11   121.    As a result of Defendants' actions Plaintiff, and the Plaintiff's prescribing

12   physicians were unaware, and could not have reasonably known or have learned through

13   reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,

14   and that those risks were the direct and proximate result of Defendants' acts, omissions, and

15   misrepresentations.

16   122.    Plaintiff sustained serious cardiovascular injuries.  Plaintiff required healthcare

17   and services incurring direct medical losses and costs including care for hospitalization, physician

18   care, monitoring, treatment, medications, and supplies.

19   123.    Defendants' conduct as described above was committed with knowing, conscious,

20   wanton, willful, and deliberate disregard for the value of human life and the rights and safety of

21   consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish

22   Defendant and deter it from similar conduct in the future.

23        WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

24   damages, and exemplary and punitive damages together with interest, the costs of suit and

25   attorneys' fees and such other and further relief as this Court deems just and proper.

26

27

28

1

## FIFTH CLAIM FOR RELIEF:
### Fraudulent Misrepresentation & Concealment

2

124. Plaintiff incorporates by reference all of the paragraphs of this Complaint as if

3

fully set forth herein.

4

125. Defendants' superior knowledge and expertise, their relationship of trust and

5

confidence with doctors and the public, their specific knowledge regarding the risks and dangers

6

of Bextra, and their intentional dissemination of promotional and marketing information about

7

Bextra for the purpose of maximizing its sales, each gave rise to the affirmative duty to

8

meaningfully disclose and provide all material information about Bextra's risks and harms to

9

doctors and consumers.

10

126. Defendants made fraudulent affirmative misrepresentations with respect to Bextra

11

in the following particulars:

12

a.     Defendants represented through their labeling, advertising,

13

marketing materials, detail persons, seminar presentations, publications, notice letters, and

14

regulatory submissions that Bextra had been tested and found to be safe and effective for the

15

treatment of pain and inflammation; and

16

b.     Defendants represented that Bextra was safer than other alternative

17

medications.

18

127. Defendants made affirmative misrepresentations; and fraudulently, intentionally

19

and/or recklessly concealed material adverse information regarding the safety and effectiveness of

20

Bextra.

21

128. Defendants made these misrepresentations and actively concealed adverse

22

information at a time when Defendants knew or had reason to know that Bextra had defects and

23

was unreasonably dangerous and was not what Defendants had represented to the medical

24

community, the FDA and the consuming public, including Plaintiff.

25

129. Defendants omitted, suppressed and/or concealed material facts concerning the

26

dangers and risk of injuries associated with the use of Bextra including, but not limited to, the

27

cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'

28

Bextra-FL-MDL                          - 25 -                          COMPLAINT

1    purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the

2    serious nature of the risks associated with the use of Bextra in order to increase its sales.

3        130.    The representations and concealment were undertaken by Defendants with an

4    intent that doctors and patients, including Plaintiff, rely upon them.

5        131.    Defendants' representations and concealments were undertaken with the intent of

6    defrauding and deceiving Plaintiff, other consumers, and the medical community to induce and

7    encourage the sale of Bextra.

8        132.    Defendants' fraudulent representations evinced their callous, reckless, willful, and

9    depraved indifference to the health, safety, and welfare of consumers, including Plaintiff.

10       133.    Plaintiff's physician and Plaintiff relied on and were induced by Defendants'

11   misrepresentations, omissions, and/or active concealment of the dangers of Bextra in selecting

12   Bextra treatment.

13       134.    Plaintiff and the treating medical community did not know that the representations

14   were false and were justified in relying upon Defendants' representations.

15       135.    Had Plaintiff been aware of the increased risk of side effects associated with

16   Bextra and the relative efficacy of Bextra compared with other readily available medications,

17   Plaintiff would not have taken Bextra.

18       136.    As a result of Defendants' actions Plaintiff and the Plaintiff's prescribing

19   physicians were unaware, and could not have reasonably known or have learned through

20   reasonable diligence, that the Plaintiff had been exposed to the risks identified in this complaint,

21   and that those risks were the direct and proximate result of Defendants' acts, omissions, and

22   misrepresentations.

23       137.    Plaintiff sustained serious cardiovascular injuries. Plaintiff required healthcare

24   and services incurring direct medical losses and costs including care for hospitalization, physician

25   care, monitoring, treatment, medications, and supplies.

26       138.    Defendants' conduct as described above was committed with knowing, conscious,

27   wanton, willful, and deliberate disregard for the value of human life and the rights and safety of

28

1  consumers such as Plaintiff, thereby entitling Plaintiff to punitive damages so as to punish

2  Defendant and deter it from similar conduct in the future.

3       WHEREFORE, Plaintiff demands judgment against Defendants and seeks compensatory

4  damages, and exemplary and punitive damages together with interest, the costs of suit and

5  attorneys' fees and such other and further relief as this Court deems just and proper.

6                              **SIXTH CLAIM FOR RELIEF**
                                  **(Unjust Enrichment)**

7       139.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if

8  fully set forth herein.

9       140.    At all times relevant to this action, Defendants were the manufacturers, sellers,

10  and/or suppliers of Bextra.

11       141.    Plaintiff paid for Bextra for the purpose of managing his pain safely and

12  effectively.

13       142.    Defendants have accepted payment from Plaintiff for the purchase of Bextra.

14       143.    Plaintiff did not receive the safe and effective pharmaceutical product for which

15  Plaintiff paid.

16       144.    It is inequitable and unjust for Defendants to retain this money because the

17  Plaintiff did not in fact receive the product Defendant represented Bextra to be.

18       WHEREFORE, Plaintiff demands judgment against Defendants and seeks equitable relief,

19  the costs of suit and attorneys' fees, and such other and further relief as this Court deems just and

20  proper.

21                                 **PRAYER FOR RELIEF**

22       WHEREFORE, Plaintiff requests the following relief:

23       1.    General damages in excess of the jurisdictional amount of this Court;

24       2.    Consequential damages;

25       3.    Disgorgement of profits;

26       4.    Restitution;

27       5.    Punitive and exemplary damages;

28

Bextra-FL-MDL                          - 27 -                          COMPLAINT

1          6.      Pre-judgment and post-judgment interest as provided by law;

2          7.      Recovery of Plaintiff's costs including, but not limited to, discretionary

3    Court costs of these causes, and those costs available under the law, as well as expert fees and

4    attorneys' fees and expenses, and costs of this action; and

5          8.      Such other and further relief as the Court deems just and proper.

6

7    Dated: May 11, 2007                              Respectfully submitted,

8

9                                                     By:

10                                                    Eduardo Rodriguez, Esquire
                                                      KIM, PARDY & RODRÍGUEZ, P.A.
11                                                    Florida Bar Number: 0165654
                                                      230 East Marks Street
12                                                    Orlando, Florida 32803
                                                      Post Office Box 3747
13                                                    Orlando, Florida 32802-3747
                                                      Telephone: 407-481-0066
14                                                    Facsimile: 407-481-7939
                                                      Email: erodriguez@bellsouth.net
15                                                    Attorneys for Plaintiff

16

17

18

19

20

21

22

23

24

25

26

27

28

Bextra-FL-MDL                    - 28 -                         COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiff demands a trial by jury on all claims so triable in this action.

3

Dated: May 11, 2007                              Respectfully submitted,

4

5

6                                                By: _____

7                                                Eduardo Rodriguez, Esquire
                                                 KIM, PARDY & RODRÍGUEZ, P.A.
8                                                Florida Bar Number: 0165654
                                                 230 East Marks Street
9                                                Orlando, Florida 32803
                                                 Post Office Box 3747
10                                               Orlando, Florida 32802-3747
                                                 Telephone: 407-481-0066
11                                               Facsimile: 407-481-7939
                                                 Email: erodriguez@bellsouth.net
12                                               Attorneys for Plaintiff

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28